Idaho's law classifies on the basis of sex, because sex is what matters in sports. It correlates strongly with countless athletic advantages, like size, muscle mass, bone mass, and heart and lung capacity. Tragically, but not surprisingly, male athletes have even injured female athletes in many sports. If women don't have their own competitions, they won't be able to compete. Gender identity does not matter in sports, and that's why Idaho's law does not classify on the basis of gender identity. It treats all males equally, and all females equally, regardless of identity, and its purpose is exactly what the legislature said, preserving women's equal opportunity. In fact, it's our friends on the other side who want to classify based on gender identity. They're seeking special treatment for males who allegedly lack an unfair advantage, but only if those males also identify as transgender. Denying special treatment isn't classifying on the basis of transgender status, it's consciously choosing not to. Idaho's sex-based classification would get intermediate scrutiny if Hecox challenged it, but Hecox's requested relief presupposes separate women's sports. All Hecox challenges is the law's application to a tiny subset of males who identify as transgender and suppress their testosterone, but that's not how intermediate scrutiny works. Idaho's law is a substantial fit for 99% of males, and a perfect fit is not required. If it were, that would be the end of all sex-based classifications. Finally, a word about mootness. When trying to avoid mootness below, Hecox told the court, I intend to play women's club soccer this semester, next semester, and through the remainder of my time at BSU. A contradictory post-cert affidavit does not make it absolutely clear this controversy is over, so Hecox's formidable burden isn't met, and this case isn't moot. I welcome the court's questions. There'll probably be some questions about mootness, but I'd like you to, in focusing on the equal protection analysis, in here, the sex classifications in sports is not being challenged. That's correct. How does that work in this case, when we're talking about one individual being accepted from a particular, or included in a particular category? There's no basis for heightened scrutiny, intermediate scrutiny in that situation, Your Honor. If the sex-based line passes intermediate scrutiny, which no one disputes that it does, then the edge cases, the potential exceptions, that's all rational basis for review. That makes no sense to me, all right? And I don't know how you can say sex classification is not being challenged. There's no question here that a male who identifies as a female, but it's a male, is being excluded from a female sport, correct? That's correct. All right? By its nature, that's a sex classification. And all sex classifications, we have said repeatedly in our case law, require intermediate scrutiny. Now, what you're saying is, well, she's not challenging males generally not playing. She just doesn't want to be the one male excluded. So it's a subclass of people that she's challenging, correct? Yes, I could answer that. All right. So how do you square our various case law, Caban, Lear, Claiborne, VMI in particular, all of whom involve a subclass of people who challenged on equal protection grounds, their exclusion from a definition? I'm happy to take those cases in order, Your Honor, starting with Caban. There is no notion of as applied anything in Caban. In Caban, it was a facial challenge to the statute. And individual circumstances were used as examples to prove that the statute was overbroad and lack of substantial fit. That's what she's saying here, that the state interest here is the safety of women, correct? And promoting competitive competition. That's the state interest. And in Caban, the state interest was in ensuring that only children with active parents, let's say, were given a state benefit, correct? Yes. And Caban was struck down facially. The statute was considered unjustified. How about Lear? In Lear, we had the same... That's the opposite. That's the subclass, the people who were excluded. In Lear, the court said, the law would be justified with respect to you, the plaintiff. And because the law would be justified with respect to you, you are not able to challenge the law elsewhere. All right. How about VMI? That distinction doesn't make any sense to me. It's still an exception. It's a subclass of people who are covered by the law and others are not. That's what we said. The VMI case is the flip side of Idaho's law. The VMI case, equal opportunity required letting women in to previously single-sex spaces. In this case, equal opportunity for women requires giving women separate spaces. And VMI said that was okay. VMI said separate housing... That's begging the very question at issue here. You can have a sex classification based on sex. You just have to have a reason for it and one that matches your exclusion. What you're trying to say is we don't even look at the reason to see if it has a scientific basis. The reason we don't look at the reason in this case to see whether there's a scientific basis is because no one disputes that there is a scientific basis for separate... Oh, but there is a dispute of that. I'm sorry. Are you then saying, Mr. Hurst, that there really is no such thing as an as-applied equal protection challenge? No, Your Honor, but what I am saying is that equal protection, the question is whether the classification is valid and not whether it makes sense in individual situations. That sounds to me as though... I think our precedent is actually very sparse in this area, sort of surprisingly sparse. But it sounds to me as what you're saying is as long as the classification is facially valid, a person does not get to come in and say that with respect to some subclass, a small subclass in this case, a person doesn't get to say with respect to some subclass there's a mismatch, that the justification has run out, that the justification doesn't apply. You're saying that that really is just not an available argument. I agree. That is not an available argument, and I think this Court has taken that approach, our approach, in cases from Convy-Chevin all the way to Wynne, and Wynne is the best example because there the petitioner had been raised in the United States by the U.S. citizen father, and the Court said Congress's interest in making sure there's a connection with the United States is enough to justify the classification. Well, this petitioner obviously had the connection with the United States. There was no basis to apply these justifications to that petitioner. It didn't matter. I mean, one thing that this case could be about is, and in this case I mean generally this litigation, is whether the plaintiffs are right here that there is a mismatch, right? And some of your briefing addresses that question, right? You can take all the hormones in the world. You can take all the puberty blockers in the world, you say, and there still will be a competitive advantage. That's one thing that this litigation could be about and one way to resolve this litigation. Another thing that this litigation could be about is this deeper and, as I say, surprisingly unanswered in my mind, equal protection question about what an as-applied equal protection challenge is and whether they exist. And I guess, you know, you're suggesting that we should, well, I don't really know what you're suggesting because here you're saying, look, just do it that way. They could be right on the science and we would still win. A lot of your briefing really contests their view of the science. So which way should we think about this case? We think that equal protection jurisprudence is about the validity of classifications. It takes a classification to trigger the doctrines to begin with and then you ask, is the classification justified under intermediate scrutiny? And so we think that's the right approach. Is the classification justified? Not is it justified in each individual instance because, as Wynn said, this Court has never held, Wynn said, that a law has to be capable of achieving its ultimate objective in every instance. And as soon as that possibility of forcing the legislature to justify the law with respect to individual plaintiffs is on the table, intermediate scrutiny is over. That is strict scrutiny. Can I question the premise that you are putting forward? Even if I agree with you that equal protection is about, is this classification justified? I think that begs the question, what is the classification? And so to the extent that you have an individual who says what is happening in this law is that it is treating someone who is transgender but who does not have, because of the medical interventions and the things that have been done, who does not have the same threat to physical competition and safety and all of the reasons that the state puts forward, that's actually a different class, says this individual. So you're not treating the class the same. And how do you respond to that? In other words, the as applied challenge essentially redefines the class or one could think of it as that. And so what's wrong with that, number one? And how do you square that with our holdings in Kaban, which Lehrer later described in this way? In other words, Lehrer suggested that Kaban was establishing that as applied challenges of this nature do exist. Certainly the, take a second question first. Kaban says nothing about as applied. I know that Lehrer says, Lehrer, this was an as applied case, but simply reading Kaban, it does not say that. It simply applies. I understand, but those two cases were in juxtaposition with one another and Lehrer comes out the way it does, distinguishing Kaban on the basis that it's an as applied challenge. And we and Lehrer have a facial challenge and it's basically the same fact. So if you're right, those two cases can't come out the way they do. I don't think so, Your Honor. Again, Lehrer was actually briefed as a standing argument of maybe you might be able to argue that this law is overbroad, but you individually are not in the overbroad part and therefore you don't get to challenge it. The court didn't use standing language, like express standing language in the opinion, but that is the logic of the opinion. Mr. Hurst, there's another way to think about the case. Your friends on the other side posit, and that is that transgender status should be conceived of as a discreet and insular class subject to scrutiny, high discrutiny in and of itself. Given the history of de jure discrimination against transgender individuals in this country over history in immigration and family law, cross-dressing statutes, they get a long laundry list. And I'd like you to respond to that. Certainly, on the de jure discrimination point specifically, there has been some discrimination against transgender people, significant discrimination against transgender people in the history of this country. The same can be said of many groups. The same could have been said of the mentally disabled in Cleburne, et cetera, et cetera. I think Justice Alito's concurrence in scrutiny is helpful with this in saying this quasi-suspect class or suspect class process, what we're really looking for is classes that look like race or like sex. And if you compare the discrimination in this case, where not one of the laws they cite actually classifies expressly on the basis of transgender status, if we look at that history and we compare it to the history of African-Americans and women who were not able to vote, who were not able to own property, who had express classifications based on their status written into the law for most of this country's history, these things don't compare. They're just not alike. No, please. There are two things in that answer that are kind of at odds with one another. You start by saying you don't question that there's a history of discrimination, I assume de jure in this country, and then you say, well, but they don't classify on that basis. How should we think about that? I think that the famous footnote four helps, right? Has it been a discreet and insular minority? Has it been a group of people that were recognized as a group where laws were passed on the basis of their membership in that group demonstrating that they lacked the political power to protect themselves in the political process? This is from Justice Barrett's concurrence, of course. We just don't have any of that here. All they can point to is conduct. It says, you know, no cross-dressing, no drag performances in bars, these kinds of things. As I think our friends on the other side would admit, people cross-dress who aren't transgender. This is not a classification on that basis. What do you do with the legislative history in this case where the people who introduced the bill called it a transgender bar? So in answering Justice Gorsuch, you said there's no evidence of that, but there's certainly a lot of comments in this bill when it was passed. Your Honor, I respectfully disagree. I am aware of nothing in the legislative record that says that. I know that the Ninth Circuit opinion says that. But if you'll notice, the key quote the Ninth Circuit relies on puts the words transgender women in brackets. And if you look up that colloquy in the legislative record, in their transcript that they provided at the district court, the word transgender, gender identity, et cetera, do not appear in that in that section of the transcript. I'd like to go back to the mootness question that Justice Thomas talked about, but not addressed here at all. Yes, this respondent made certain allegations about her intent at a certain point, but she signed an affidavit with this court attesting that she has permanently stopped playing sports covered by the ban. She will not try for any school sponsored women's sports. And in fact, I think she'll finish school very shortly. And there's no reason to question the sincerity of that belief, given that dropping out of sports puts you at a disadvantage where you lose your competitive edge and she's going to graduate soon. How is this different than Atchison Hotel, where the person in the litigation made representations that she intended to visit and continue visiting hotels in the future? And then when the case got before us, she voluntarily dismissed those suits like here with prejudice. And we've then directed that the case be considered moot. How is that different? To begin with, I add one further difference between the two cases here. It's not like she's attempting to avoid us reaching the question in just a little while. We're going to reach the identical question in another case. So we don't have a set refuge in attempting to stop the court from reaching an important legal question. I'll start with Atchison Hotels, Your Honor. In Atchison Hotels, no one disputed that plaintiff's plans going forward. In this case, even the district court does not credit the plaintiff's plans going forward. The district court struck the notice of dismissal and said, Hecox's plans have changed before. Hecox's plans could change again. And also, the court feels that this is somewhat manipulative in order to escape the Supreme Court's jurisdiction. None of that existed in Atchison Hotels. And that puts us in the city of Erie territory, where in that case, the premises were sold. The business was closed. The owner was in his 70s. And they said, That's not enough. You could still reopen this business. Your company is still incorporated under these circumstances, whereas the respondent seeking through post-sufirari maneuvers to moot the case. That is enough. This case isn't good. Thank you, Counsel. Justice Thomas. Does the justification for a classification, as you have in Title IX, male-female sports. Let's take, for example, an individual male who is not a good athlete, say a lousy tennis player, and does not make the women's and wants to try out for the women's tennis team. And he said, There is no way I'm better than the women's tennis players. How is that different from what you're being required to do here? It's not at all different, Your Honor. And that's exactly what we're concerned about, that there are arguments about needing to make exceptions from intermediate, from an otherwise valid classification for people for whom that classification doesn't make sense. Those arguments don't limit themselves to people who identify as transgender. Many males could say, I can't really compete with the women's basketball team, and therefore I should be able to try out. And I haven't seen an answer from the other side as to why they couldn't. Beyond, I correct myself, they say that, well, those people don't face the same dignitary harm as transgender people. But I don't see how that's relevant to the intermediate scrutiny analysis. The analysis is, is this classification substantially related to legitimate state interests? The person's reasons for wanting to violate the classification don't come into the analysis. This is Leo. Justice Sotomayor raised the question whether the issues here are identical to the issues in the case we're going to hear in a couple of minutes. And I'd appreciate your views on that. Suppose we affirm or reverse in this case, I'm sorry, in the other case, would that leave something undecided with respect to your case? All right. Yes, Your Honor. Our case involves the issue of the constitutional definition of sex, which the Ninth Circuit made a decision about what sex means for constitutional purposes. The Fourth Circuit did not make that decision. We will be bound by that decision going forward unless the court reached that question. That said, I would I would dispute the premise of the question, because whether or not the court has Article III jurisdiction in this case does not depend on what the court might do another day in a different case. No, that wasn't the premise of the question. It was just an attempt to explore the consequences of deciding the movements issue one way or the other. Thank you. Thank you, Your Honor. Justice Sotomayor. There's a munching where GVR that's being agreed to here. So you're not bound by anything in this case. And our decision there will inform any new decision in the Ninth Circuit on this issue. Correct. Whatever analysis we adopt. In the little case, we'll control what happens in a new case. That is the law, Your Honor, yes. With respect to the Erie case there, the 90 year old man never said he didn't intend to open another business. He just said this business. And that was a distinction we saw here. She has said, I don't intend to do this now. Every other promise that she made in this litigation that she was going to continue trying out, that she was going to stay in sports, held true until this case and the negative attention she received. Correct. To say she misrepresented her intent is going a little extreme when she honored all her previous intent and only changed her mind when new circumstances arose, i.e. The notoriety of this case, correct? No, Your Honor, nothing changed externally to to the plaintiff's affidavit filed in this court says that there has been negative attention and so forth since the beginning of this case. The only thing that changed to this court granted certiorari. And then after that, the plaintiff said, I want out and so I will stop playing sports. Do you dispute that having a case named after you? Makes your infamous infamy live forever. No, you don't think that Brown and any of the other names, plaintiffs that we have in famous cases. Drawing attention to those people as people, have you studied your law cases? Students do all the time. I think one of my colleagues had a course where they looked at the lives of the plaintiffs. Do you doubt that having a named case with such an eventful event is going to continue attention on this person? I don't doubt there will be attention and I can give attention and I confess I have studied a few law cases, but have you studied the people to some degree, Your Honor? What I would disagree with is there's no background principle of plaintiffs get to receive the litigation whenever they want, even rule 41, even in just the district court. The rule is that once the litigation hits a certain point, you can't leave. So what you're going to assume, I know you don't want to, that you were to lose this case, you would say that we have to force an unwilling plaintiff who has offered to dismiss with prejudice, promise not to incur this activity again. We would force that person to continue prosecuting this case. The court did in the city of Erie. That it did there, but is it the right thing to do? We didn't do it in Atchison. In Atchison, no one disputed that the case was moot. The only question was which Article 3 question would be decided first. In this case, we dispute the case is moot. We dispute all the facts that this is based on. This is a formidable burden that Hecox bears. That's from already the Nike, to show that it is absolutely clear that this conduct cannot be reasonably expected to reoccur. We think as the district court said in its striking order, that based on the changing history here, based on the past conduct, as Scalia mentioned in his footnote three of his city of Erie concurrence, there is a reasonable basis to doubt whether Hecox's current plans are the final plans. And as long as there's a reasonable basis not to credit the current plans, Article 3 lets the court hear the case. Justice Kagan? Mr. Erso, I want to take you back to our conversation about whether there's such a thing as applied equal protection challenges and ask you for two things. The first is, I do think that that runs counter to a couple of things that we think of as basic principles of constitutional law and maybe equal protection law particularly. In constitutional law, we often say as applied challenges are the preferred mode of constitutional inter adjudication. Certainly we have not erected like bars to them in any other area as far as I understand it. And then in equal protection law, we say all the time things like people need to be treated as individuals and not as just as members of a group. And I'm wondering whether both of those principles don't suggest that any bar on equal protection as applied equal protection challenges is just wrong, is off. And then the second thing I want you to do after you do that is assume for me that there is such a thing and to tell me how in your view an as applied equal protection challenge ought to work in this case. Certainly, Your Honor. The first answer would be I recognize those principles that Your Honor is alluding to. The contrary principle would be the very nature of intermediate scrutiny analysis that it is always possible if you only have a substantial fit supporting what supporting legislation, then it is always possible to find people whom it doesn't fit. And then we're in strict scrutiny. I completely take that point, Mr. Hearst. I mean, you're exactly right. And of course, intermediate scrutiny is different from strict scrutiny. It doesn't require the, you know, almost perfection that strict scrutiny does completely take the point. But isn't that point really addressed to what we often consider in these areas, which is to facial challenges? Right. So when you bring the facial challenge, of course, that's right, that you're allowed to have under over inclusiveness and under inclusiveness and a lack of a perfect fit. But that the nature of an as applied challenge is different. Certainly, the court could do that, Your Honor. The court has not done that before, as I think we both agree. And the result of that would be judge made exceptions to laws anytime judges thought they didn't make sense for particular classes of plaintiffs. And the deference to the legislature that should exist to some degree, even under intermediate scrutiny, would be done away with. It would be gone. And then the administrability justification for many sex based classifications, including this one, would also be gone because you could no longer administer the classification evenly. You would have to make as many exceptions as courts thought you needed to make. So it's really an institutional competence thing or institutional power thing between courts and legislature. So you're suggesting to me that the whole thing is just unworkable and we shouldn't. But you flipped it in the second prong of my question, which is suppose we said, yeah, as applied equal protection challenges exist as as applied anything challenges do, what would it look like, do you think? What should it look like? Yeah, I'm not sure what it should look like. I can say what it does look like in this case and why we think there's a problem with it. You're not willing to take me on my second path, which is like, let's assume that there is such a thing as this challenge. Yes. I mean, the most I can say, I doubt this is the exact answer, Your Honor. But the most I can say is that the as applied nature of challenge might go to the remedy. The legal analysis still focuses on the classification and the justification for the classification. And once we're talking about individuals, we're not talking about a classification. Yeah, I mean, that doesn't seem like much of an as applied challenge, right? You have to prove the exact same things you do in a facial challenge. But don't worry, because you only get relief as to you. So that's that's not a true as applied challenge. And this is I'm having trouble coming up with what it could look like, because it will always be possible to carve the class down further. Right. I mean, so if they say that their class, their subclass, I guess, subclass of males is males who identify as transgender, then we would come back and say, well, only something like 10 percent of males who identify as transgender take the testosterone suppression. And then they might say, well, OK, no, the class is just the males who take testosterone suppression. And then we might come back and say, well, according to the record, according to their own expert of males who take testosterone suppression, only one quarter of them are able to achieve the appropriate to able to achieve ordinary levels of testosterone for women. And the other three quarters would still have an advantage. And therefore we'd be justified. Seventy five percent, pretty good fit and intermediate scrutiny and we'd be justified with the law. But then they can just change the class again. They can say, aha, no, our class is males who identify as transgender, who suppress their testosterone and who suppress their testosterone successfully and are able to get it down to where they don't have a competitive advantage. And at that point, we can say if you can define the class so precisely, you can force the state to define the class that precisely. It's going to be enormously burdensome for everyone. And the state can never win because whenever the state points to the fit in the statute, they just redefine their class as only the people who are outside the fit. Thank you. Justice Gorsuch, Justice Kavanaugh, to follow up on something you were talking about, Justice Sotomayor, would your constitutional position be different if the law explicitly stated that transgender women and girls cannot participate in women and girls sports? My answer to that depends on what's in the rest of the law. So I would refer back to Schermetti and say it's not a magic words test. The mere presence of the word transgender in the statute is not enough to make it a transgender based classification. What would make it? If the law, either expressly or through its effect, let all males except males who identify as transgender participate in female sports, but made it so that somebody's ability to play in female sports depended on transgender identity, assume that the law does not allow males to play in women's and girls sports and then explicitly says separate provision, transgender women and girls, biological males who identify as female cannot play in women's and girls sports. Would your constitutional position be any different in that situation? No, Your Honor, I think that's Schermetti. I think that would be a reference to transgender identity, but the law's application would never turn on transgender identity. So it wouldn't be a transgender status, even if it says transgender. The word transgender in the statute might be relevant to a pretext analysis, but it wouldn't be relevant to the facial classification if that word did not change how the statute applied in practice. How many states allow biological males who identify as females, transgender women and girls to play in women's and girls sports? Statutorily, I'm aware of 27 states that take our side and do not permit that, and 23 states that take the other side and do permit it. And those states who do allow it, are they, is your position that they are violating the Constitution, the Equal Protection Clause, rights of biological girls and women by allowing that? Or do you say that's up to each state to decide and that the Constitution gives discretion to the state whether to allow it or not to allow it? I have not yet been persuaded by a constitutional theory that would let us use the Equal Protection Clause to impose our policy on other states in this matter. Justice Barrett? I have some questions about the implications of your theory. So how would your theory play out if we're talking about six-year-olds, where there's no difference between boys and girls in terms of athletic ability, testosterone levels, et cetera? Could you have sex-separated teams then? Or sorry, sex-separated teams by biological sex and not allow trans girls? Certainly, Your Honor. First, I'd like to explain how the statute applies to that situation so I can put my answer in context. There are no six-year-olds in the state to whom the statute applies because there are no school-sponsored... That's why it was a hypothetical. Okay, right. Yes, but it would be the normal intermediate scrutiny analysis. And are we saying it applies only to six-year-olds or to everybody across the board? Well, I'm just trying to give you a hypothetical. I mean, yours is driven by testosterone levels and differences in athletic capability. So I'm asking you, what if you try to take that out of the equation and you're just drawing the line based on biological sex and saying that trans girls can't be on the girls team in an age group that's prepubescent? The record in this case does not support the notion that males lack an athletic advantage at six years old. That's about as early as the science goes from what's in the record. And even at that age, males have about a 5% athletic advantage over girls in most situations. Now, if this is not a level of competition where anybody cares about that, the simple solution is the solution you see in most places, which is you have co-ed sports. You don't divide the teams based on sex, and everybody can play. And Idaho's law does nothing to interfere with that. And remind me whether Idaho's law, and I guess your answer made me think of this, and I guess this goes to the question of whether the law discriminates on the basis of trans status. Is it true that biological girls, trans boys can play on boys' teams? Anyone can play on boys' teams, Your Honor. Anyone can play on boys' teams. Okay. And to the point about medical uncertainty and scientific uncertainty, you were talking about what advantages you might have even that are apart from testosterone levels. Your friends on the other side say that, listen, science is uncertain, and so we need more factual development. It's not really clear how much of an athletic advantage boys and men have if their testosterone levels are below a certain point. How does that play out? Tell me why we don't need more fact-finding, or what is the state's burden in showing what the state of scientific certainty is? Do we have to defer to the state, presumably at some point, if deference is due? The state would have too little scientific evidence to really get that deference. Tell me how to think about that. The first question would be, are we applying intermediate scrutiny? And we argue that the court shouldn't. But leaving that aside, if the court is applying intermediate scrutiny, then we'd say it's Turner Broadcasting that says the legislature, first known case, applied intermediate scrutiny and said, under intermediate scrutiny, the legislature has to draw reasonable inferences from substantial evidence. It does not need to act only on scientific consensus, which is what the district court in this case assumed incorrectly. Thank you. Justice Jackson? So I think I'm going back to your discussion with Justice Kagan. I'm not sure I understand why you're characterizing the as-applied challenge in practice as the individual coming back and proposing a different classification, as though we're doing an analysis of the classification in the way that you suggest. I thought that the state has a classification that is its general rule. No individuals who identify as female but were sex at birth male can play in women's sports. And that the individual, then, is merely seeking an exception based on their individual capacity because the state's general rule is based on fairness and medical science and all of these things. Do I have this? They're not proposing an alternative class, necessarily. They are just saying that I should be accepted from that general rule on this basis. We agree that an exception is what they are seeking, Your Honor. And it's an exception based on transgender status, again. But that's the way the rule used to work, right? I just want to be clear about what we're talking about here.  I understood that this law originally was exactly that. That you basically said no transgender women in girls' sports, but we'll look at your evidence and look at your circumstances and decide whether or not you individually can be included. Is that what used to happen? As a matter of Idaho law, there was no law whatsoever before this. Is that what was happening on the ground in Idaho law? That's what NCAA policy permitted from 2010 to 2022. Before 2010, the NCAA policy matched ours. Since 2025, the NCAA policy has matched ours. But what I'm asking is, if that's the act here, not that all transgender women be allowed, but that this particular plaintiff be allowed based on their circumstances, why is that so not administrable or proposing a different classification that we're not going to be able to sustain? I don't understand. First, as to administrability, Your Honor, making sure that a transgender athlete does not have an unfair advantage would require ongoing testosterone monitoring because certainly testosterone can fluctuate. That is invasive. That is intrusive. But that's the burden of the person. The person who wants to play has to demonstrate to you, to whatever degree of scientific certainty, that they don't have a competitive advantage. Why would you not allow that? I guess I don't understand. The second answer is that there's nothing in that argument that limits itself to transgender identifying athletes. If this athlete doesn't have an advantage over women and therefore can compete safely, then there are other athletes who say for different reasons that they don't have an unfair advantage and therefore they can compete safely. Yes, I understand that. There are legal arguments. Let me ask you something about the classification. I guess I'm struggling to understand how you can say that this law doesn't classify on the basis of transgender status. The law expressly aims to ensure that transgender women can't play on women's sports teams. So why is that not a classification on the basis of transgender status? I'd apply Spermetti again. The question is whether the application of the law turns on transgender status and it doesn't. It turns on sex. The legislature did not want to exclude transgender people from sports. It wanted to keep women's sports women only and exclude males from women's sports. No, I understand. But with respect to two individuals, a cis woman and a trans woman, who both want to play on a team that reflects their gender identity, this law operates differently based on their sex, right? The law does operate differently based on their sex, as Your Honor just said. It does not operate differently based on their transgender identity. But it treats transgender women different than cis women, doesn't it? It has a disparate impact because men who identify as transgender have a different reason for wanting to play women's sports than biological females do, right? But if that were enough, then Spermetti would have come out a different way. Gadulda would have come out a different way. Other cases would have come out a different way. I'm blanking on the other one. All right. Finally, let me just ask you about mootness because it's a little odd, I think, that a defendant would not want a case dismissed. Ordinarily, the defendant is the one who's claiming mootness because they've been sued. So this plaintiff has brought a claim against you and the claim relates to your policy about college sports. And as I understand, the plaintiff is about to graduate. So wouldn't we have a mootness problem potentially notwithstanding any representations that the plaintiff made? I don't think so, Your Honor. I'd look to Camretta as the best case for telling us how we analyze mootness in this situation. Does the petitioner still have an interest in continuing the litigation? Only for a few more months. What if this decision doesn't come out until June and she graduates in May? It's my understanding at this point, I defer to my friends here, it's my understanding at this point that May graduation is not possible. For this individual? For this individual, that's correct. All right. Thank you. Thank you. Thank you, Counsel. Mr. Muthan. Mr. Chief Justice, and may it please the Court. It is undisputed that states may separate their sports teams based on sex in light of the real biological differences between males and females. States may equally apply that valid sex-based rule to biological males who self-identify as female. Denying a special accommodation to trans-identifying individuals does not discriminate on the basis of sex or gender identity or deny equal protection. All of that remains true, even assuming a man could take drugs that eliminate his sex-based physiological advantages. The law is reasonably tailored, regardless of whether it is perfectly tailored as applied to any such tiny subset of men. And states are not required to redefine sex or monitor the testosterone levels of female athletes. In short, male athletes who take performance-altering drugs are not similarly situated to female athletes and states need not treat them the same. I welcome this Court's questions. Would you elaborate on what you alluded to, and that is that whether or not a state has to, its asserted interest in classifications has to bear out in each individual case. That seems to be what the applied challenges in individual cases would require. Intermediate scrutiny requires a substantial relation or a reasonable fit, which is not a perfect fit. And this Court has recognized, and I point this Court to Edge Broadcasting in particular, it focused on this exact issue of if the law is substantially related in general, can an individual come in and say, well, as applied to me individually, it's not. And the Court said, no, we're not going to allow you to do that because that would essentially convert intermediate scrutiny into strict scrutiny on an as-applied basis. Now, I'm not disputing that you can sometimes bring as-applied claims under intermediate scrutiny. So if, for example, you had a law that applied, this sort of law that applied to sports, but also math and also chess, it might be that as applied to math or chess, it was invalid, but it was valid as to sports because for math and chess, at the level of the classification, it's not reasonably tailored. But here, critically, everyone agrees that for sports, for 99% of men, it's reasonably tailored. It's just the 1% of trans-identifying individuals who take drugs and then those drugs are effective. That's a problem. And this Court's decision in Michael M makes clear that that's not a viable as-applied claim. In Michael M, this Court upheld a statutory rape law that applied differently to men than women, and the rationale was because women faced a unique risk of pregnancy. But of course, if either the male rapist or the female victim was infertile, there'd be no pregnancy. So on their theory, you could have come in and said, well, I have an as-applied claim, but I was infertile, so it was okay to rape the underage girl. And this Court not only rejected that, the Court said it would be ludicrous, ludicrous, to say that you could bring an as-applied claim for pre-pubescent girls. That's just not the way as-applied scrutiny works in intermediate scrutiny cases. That's equally true, as my friend said, in Nguyen. In the Court's decision in Nguyen, the justification for the law was making sure that the parent knew that they were the parent and had an opportunity to have a relationship with the parent. But Nguyen's father knew about the birth, was present with Nguyen the whole time, and brought Nguyen to the United States. Nevertheless, the Court held for the class of men overall, it was reason-tailored, and they weren't going to focus on the specific facts of Nguyen. You started, Mr. Mupon, by saying that you did think that there were as-applied equal protection challenges and giving an example of, well, if it had also applied to the chess team or something. But that doesn't seem like an as-applied challenge to me. That seems as though there's just a provision of the law that's facially invalid, right? So let's put those kinds of cases aside where you can split the law up and say, this part is facially invalid, this part isn't, and focus instead on, like, real as-applied challenges. Your classification is basically, okay, let's posit, because there's a substantial relationship to your goal. Is there ever a time where a person can come in, either on behalf of herself or on behalf of a subclass, and say, notwithstanding that there is no valid facial challenge here, there is an as-applied challenge, this subclass has to be exempted? So it's a hard... I don't think this Court's cases have ever squarely addressed that. I think if it could be brought, it would have to be a very substantial percentage. So to give you a stylized hypothetical, if you had a law that regulated on the basis of sex, and you can imagine three subgroups of males, for subgroup 1 and subgroup 2, each of whom were a third of men, it was reasonably tailored. But for subgroup 3, which was a third of men, it wasn't. Maybe in a circumstance like that, the third subgroup would come in and say, for a third of the applications of this law, it's not reasonably tailored, that's not enough of a substantial effect, at least for us, even if you're going to uphold the law for the other two-thirds of men. But why does it have to be that many people? Why? Why? I don't understand why that subclass can't make this showing and get the remedy as to them. Because if it's one person, you're basically converting the law into strict scrutiny. But you're not. You're not. I mean, because what you're doing is you're allowing that individual to get the remedy that we've said in cases like CASA is the only thing that's available, that you can't have this flow to everybody. It's just about this individual and whether or not he's been unconstitutionally treated. So, again, because if the law is reasonably tailored for 99.99999% of people and you come up with a point fraction of percent and say that that person has a viable claim, that's more than you would ever require under strict scrutiny. I don't know... But, I mean, what's the result of that? If you're making a facial challenge, I understand that you're saying that if the law has such a broad sweep of constitutionality, then we're not going to strike this thing down just because we can identify one person for whom it doesn't apply. But if you are that one person and you can show that this is unconstitutional as applied to you, I guess I don't understand why it matters that it's constitutional as applied to 99.9% of the other people. Well, because I think you're begging the question when you say it's unconstitutional applied to you. Laws that classify on the basis of sex only need to be reasonably related. And so if it's reasonably related because it's tailored for 99% of people, then it is constitutional even applied to... Even as applied to you. So you are saying there is no such thing as an as applied. No, again, if there was one where it was a third of the people, I can maybe understand a claim that the third of people, it's not reasonably related for them even though it is for two-thirds of the people. I'm just saying that when the numbers get as small as they are here, that claim's not viable. And we know that from this Court's cases. Again, Michael M., every infertile man... We didn't do that same kind of quantitative analysis in Caban. We didn't ask the husband in Caban to figure out where he stood relative to all husbands to whom this was applied. Let me talk about both Caban and Lehrer. Caban is not an as applied child. Caban did not say that there were some set of people for whom that law was valid. The differential treatment... Itself. Lehrer said that about Caban. So what Lehrer held was the father and Lehrer had abandoned the child. And what Lehrer essentially said is if the mother had abandoned the child, the mother wouldn't get a veto. Can I read you what Lehrer said about Caban? Discussing Caban, Lehrer explained,  we have held that these statutes may not constitutionally be applied in that class of cases where the mother and father are in fact similarly situated with regard to their relationship to the child. So Lehrer is interpreting Caban as an as applied challenge, isolating a subset of people where there's not actual similarly situated circumstances. And Lehrer is different. It is a facial challenge. It is in opposition. No? That sentence in Lehrer, the facts of Lehrer, there was no differential treatment. The father and Lehrer had abandoned the child and the court basically rejected this claim because if a mother had abandoned the child the mother also wouldn't get a veto. So Lehrer is a case where the plaintiff lost because there was no differential treatment at all. Caban is a case where the plaintiff won because the classification couldn't be justified. The only way those cases would support their position is if either Caban or Lehrer had said there is some set of cases where the woman gets a veto but the father doesn't and that's fine. And neither Caban nor Lehrer said that. This court has never said in the line of cases that the mother can get a veto but the father doesn't and that's perfectly okay. So that's what they're arguing and neither of those cases support it. You also asked about VMI so if I could just briefly address why VMI doesn't support them either. In VMI the point was yes, lots of women wouldn't want to go to VMI but also lots of men wouldn't want to go to VMI. As to the set of people who were actually burdened by the exclusion all of the women the law was not fairly tailored. The argument that VMI that Virginia was making VMI was essentially equivalent to the following. If MIT said, you know, most women and frankly most men can't meet our math and science standards so we're just not going to allow women to come to MIT at all. Of course this court would reject that argument. That was the argument that they were making in VMI that just very few women wanted to attend but for the set of women who wanted to attend the law was not properly tailored because there was no justification for excluding them. Thank you, counsel. Justice Thomas. Justice Alito. Under Title IX what does the term sex mean? We think it's properly interpreted pursuant to its ordinary traditional definition of biological sex and I think probably given the time it was enacted, reproductive biology is probably the best way of understanding that. Thank you. Justice Sotomayor. You know, the problem I'm having with what you're doing now is you're doing exactly what Justice Stevens said should be done and he admitted later in O'Connor that the court roundly rejected that in Caban and Lear. He wanted to do exactly what you said. He said this court should be analyzing equal pretension contending that if the classification is justified in those cases in which the rule has its most frequent applications then it doesn't violate equal protection and then he said the court should presume that the law is entirely valid and requires a challenger to demonstrate that its unjust applications are sufficiently numerous and serious to render it invalid. It's exactly what you said we should be doing. So you want us to accept what the dissent did and not what the majority said it was doing in Caban and Lear. In VMI Justice Scalia said the same thing that taking the majority's logic to its logical conclusion, a single woman who wanted to attend could satisfy the admissions requirement would be enough for an as-applied challenge and that shouldn't be the law. You're asking the court to adopt views expressed by two minority dissenting judges in this case. We've been doing an awful lot of that lately but you're smiling because it's true but you're asking us to adopt an approach that we have rejected as a majority court and accept what dissenters are doing, correct? With all respect, no. Again, in Caban, nowhere in the majority opinion in Caban did they say this law is reasonable for certain classes of men but it's not reasonable. It did exactly. It said it's reasonable for fathers it's reasonable for fathers who who don't support their children. It won't be reasonable for fathers who don't. With all respect, Your Honor, it did not. Caban did not uphold that law as applied to any man who hadn't abandoned their child. Now it is true Laird's upheld the law for someone who had abandoned their child but the reason it upheld the law was because of women who had abandoned their child. But the logic of the opinion is that if the reverse had been true it would have ruled the way it did. I don't think that's true. I just have one last question. What's percentage enough? There are 2.8 million transgender people in the United States. That's an awfully big figure. I do understand that in Idaho this was the first transgender child but that just happenstance as to location. What makes a subclass meaningful to you? Is it 1%? 5%? 30%? 15%? One is not enough for you but why? The numbers don't talk about the human beings. I'll say a couple of things about that Your Honor. The first I'll say is if the distinction between intermediate scrutiny and strict scrutiny is the difference between a perfect fit and a reasonable fit 1% surely has to be on the side that's reasonable. But if you don't want to just take the 1% on its own face, I'd point you toward if you want to focus on majority opinions or opinions for the court, Michael M rejected the challenge even though that law wouldn't for infertile couple, infertile either infertile rapists or infertile victims the justification didn't apply. There are certainly more infertile people But they did it on a different basis which had to do with different harms No that's not true Your Honor Well I can read the decision and tell you With all respect, that paragraph it says even setting aside the physical differences, it is ludicrous to think we have to exclude infertile children from this rape law and there are certainly more infertile people than there are trans-identifying individuals who take these drugs and eliminate all their physical advantages So if we just focus on holdings of this court, we know that this percentage is too small Mrs. Kagan Mr. Rubin, just assume with me that there is such a thing as applied equal protection challenge What would it take to bring that challenge? What should the plaintiff have to show? I think they would have to show that A, they are a substantial enough percentage to be able to bring an applied claim and then as to that group the law wasn't reasonably tailored for them. And that they would have the burden on that It's not for the state to come back and say, the state does not have to satisfy that burden initially I certainly am not the first of the two things I said. I think if you thought they could have a valid as applied claim and they had made it through the gate of saying they were a big enough class that I think consistent with normal intermediate scrutiny, I think the state does bear the burden of showing justification for that class. So I think the state would have it on the second step, the plaintiff would have it on the first step. I see, so they have to sort of get through the gate of we're big enough for you to take us seriously, but then the state has it. I think that would be how you would analyze it. And I think you were asked this, but big enough to be taken seriously, like how do we decide that? Again, the court's haven't really talked about it. I think the way I would think about it analytically is the difference between intermediate scrutiny and strict scrutiny is the difference between a perfect fit and a reasonable fit. So is there enough of a group here that we think that we're not essentially holding the state to perfection? If it's so close to perfection, then you're really undermining the difference between the two. If it's a big enough group that we're not asking for perfection I mean, are you really undermining the difference between the two? Because usually we think of the difference between the two with respect to facial challenges. So you have to do a whole lot less to show that the facial classification that you're making is okay. I don't think so. I do think that you would very much be undermining the difference between the two if you said that even a single person could bring an as-applied intermediate scrutiny case. And again, I would honor to read, as you're broadcasting, there's a whole section of the opinion that's on this exact issue that says exactly what I'm saying. Now, admittedly, it's a First Amendment case, but it's an intermediate scrutiny First Amendment case. Thank you. Mr. Scorsese, if the class is big enough, in your discussions, say a third as you discussed, might it just fail intermediate scrutiny facially? I mean, at some point do they collapse? I agree that that's part of why these are so unusual. If there's a big enough group that you've excluded, you're exactly right. It might not be reasonably related as a whole, so then it basically fails. But I could at least conceptualize a situation where it covers enough people validly that a facial challenge fails, but it covers a big enough group that it can't be justified for, then maybe you could bring an as-applied claim. I don't think this Court really needs to grapple with these fairly tricky analytical questions, because this is the world's easiest as-applied claim to reject. It is a fraction of a percent. Whatever as-applied claim you could bring, it cannot possibly be a fraction of a percent. That would be totally inconsistent with this Court's decision by Glenn and Wynn, both of which rejected claims by people who had a much greater percentage than a fraction of a percent. As you know, a lot of states allow biological males who identify as female, transgender women and girls, to play in women's and girls sports. And you heard Idaho say that the states, those states, other states, constitutionally may allow that consistent with the Equal Protection Clause. Do you agree with that? We've been challenging those laws under Title IX in the lower courts, and as we said in our brief, we would urge the Court to just reserve judgment. Can you answer the Equal Protection Clause question that I just asked? You know, I'm not sure if we've taken a position on the Equal Protection piece. Do you have a position? I don't right now. Okay, and on Title IX, footnote 2 of your brief seemed to say that you don't have a position on how Title IX applies to those states as well. No, so we do have, we are actively litigating in lower courts, and we are saying that they are violating Title IX. What the footnote said is, it's a very different question, and we would urge this Court to make clear it's not resolving that question one way or the other by what it says in this case. Okay, so you have a position on it but you don't want us to say anything about that? It's a very different question analytically, and so... I understand, that's why I'm asking. Yeah. Okay. Thank you. Justice Barrett? So, Mr. Mupen, when Justice Kagan started asking the questions early on about the as-applied Equal Protection challenges, she pointed out that there was kind of a surprising dearth in the case law, really grappling with this. But I think you wouldn't be getting all the questions that you're getting about Caban and Lehr and, you know, Michael Lam and VMI, if it weren't the case that you can read some lines of cases either way. So, let's say that there is this uncertainty we haven't really confronted it, as far as I can tell, it's because it just wouldn't be relevant in strict scrutiny because it's often fatal in fact or typically almost always fatal in fact. So it's really an intermediate scrutiny problem. Maybe it's a rational basis problem, too. I mean, maybe this would have implications for all kinds of review. Because it seems to me that if you're never talking, in any case in which scrutiny is not talking about a perfect fit, you might have this problem. What would it do, essentially? I'm just trying to think about the ramifications of allowing as applied challenges. It seems like it's at war with the theory of intermediate scrutiny for some of the reasons that Idaho said, because all lines, all classifications overshoot or undershoot. Right? So can you imagine how intermediate scrutiny works? This isn't designed to be a layup or something. It's honestly just something I'm grappling with. How would it even work going forward? So I'm not sure I can say a whole lot more than what I've already said, which is I do think it's a problem. The reason I think it's a problem is it's conflating the difference between strict scrutiny and a perfect fit, intermediate scrutiny and a reasonable fit. And I worry that if you allow as applied claims to a small enough group, you're essentially collapsing the difference, because you're essentially requiring a perfect fit. Because whenever you have a reasonable but not perfect fit, the subset who falls within that will come in and bring an as applied claim. And so the state will essentially have to have perfectly tailored laws, because any single person for whom you don't have a perfect fit should come in and bring an as applied challenge. Including, say, you know, boys who just couldn't make the team because they weren't good enough, because the law, to the extent that it's designed to protect competitiveness and safety, etc., wouldn't pose the same danger in the case of a boy who just isn't good enough to make the male team but perhaps could make the girl team. At least arguably, depending on what their exact theory is for the justification. Thanks. Justice Jackson? Yes, I'm still struggling to understand why the state would have to have perfectly tailored laws. I would think the state would just have to make exceptions where people can demonstrate that the justification that makes the state's conduct constitutional doesn't apply to them. So making exceptions is tailoring your law. That's literally what it means to tailor the law. No, but from the standpoint of a facial challenge, when we're asking whether this law has to be stricken completely because it isn't perfectly tailored, what we're doing is a different exercise in the as applied challenge. We're asking whether even though this law is overbroad, we're assuming it's overbroad now because you've got in there some people to whom it should not be applied, what do we do about that? What is the remedy that those people can get? And what I hear you saying is they get no remedy unless they can demonstrate that there are enough people that this is sufficiently overbroad that it's no longer something the state can do. Right. And I don't understand why that is. Why wouldn't, when we identify people for whom this law operates unconstitutionally, that's the premise because now I'm in remedy, right? The premise is that you have a person who successfully made an as applied challenge. This, to me, unconstitutional. You say too bad unless you can show that it's also unconstitutional with respect to a sizable number of other people. And I don't understand why that's the case. Because I don't agree with the premise that the law operates unconstitutionally as to an individual person just because it doesn't, the justification for the law doesn't apply to that person. That's what this court held in both Wynne and Michael M. It recognized that the justification that was put forward for the law might not be true for each and every person the law applied to. But this court said, that's fine. And if we read Caban and Layer to say something different, if I disagree with you, then we just Well, Wynne is the most recent of the cases. So even if you read the case that way and Wynne is explicit about this. Wynne explicitly says, I believe it's I'm not going to get the page number right, but Wynne explicitly says that we recognize that there are some men who were present at the birth of their child who have a DNA test to prove that they were the father, that have been with their kids their entire lives. In fact, that was probably true of Wynne's father. Tough luck. Justice Barrett is worried, I think she said, about the implications of allowing as-applied challenges. I guess I'm worried about the implications of not. Because as Justice Cagan said, we have consistently said that facial challenges are really hard to get, that as-applied is really all there is. So now we're in a world in which you are setting up new barriers, in my view, to establishing an as-applied challenge. So at the end of the day is your position that no matter how clear it is that the particular prescription is operating to disadvantage a particular group that classifies you, treats you differently, you're just not going to be able to get a remedy for that individually anymore. Let me take a step back and then maybe this will help. Laws that classify in general are subject to rational basis review. There's higher scrutiny for classifications on some things. For race, we have strict scrutiny. For sex, we only have intermediate scrutiny. What that means is, it is okay to have a classification that doesn't operate perfectly for each and every person. So it's not the problem that it's unconstitutional but there's no remedy. The point is that it is constitutional even though it's overbroad. I think what that means is it's okay because we realize that in some circumstances, maybe even in many circumstances, this classification is justified. But when we can identify a situation in which it's not, I don't understand why a person can't bring that challenge. I can't say anything better than in both Michael and Wayne, the court recognized that there were people who were in California and they didn't give them a remedy. Thank you. Thank you, counsel. Ms. Hartnett? Mr. Chief Justice, and may it please the court, Idaho concedes that HB 500 draws a sex-based line by categorically excluding all students with a biological sex of male from women's teens. Sex classifications like that are closely scrutinized under the Equal Protection Clause to ensure they rest on evidence, not supposition. Idaho's articulated justification for this line is to protect women's sports from birth sex males because of their quote, biological advantages. That means HB 500 is aimed at controlling for sex-based biological advantages, not for all the many reasons one athlete may be better than another that have nothing to do with sex. On the preliminary record in this case, and as the experts below agreed, circulating testosterone after puberty is the main determinant of sex-based biological advantage that HB 500 sought to address. And on this record, Lindsay Hecox has mitigated that advantage because she has suppressed her testosterone for over a year and taken estrogen. HB 500 thus fails heightened scrutiny as applied to Lindsay and transgender women like her who have no sex-based biological advantage as compared to birth sex females. That analysis would come out the other way for the untalented cisgender boy. He would have the same sex-based advantage, the circulating testosterone, he just would not be as good at sports. It also would come out the other way here, for example, if a transgender woman had gone through a male puberty and had not mitigated that advantage. This court's cases have recognized that when the government's justification for a sex-based classification does not apply to a discrete subgroup of those classified, that classification is unconstitutional regarding that subgroup. And that holding in Caban, which I'm sure we'll discuss further, has been repeatedly referred to and reaffirmed, including more recently than Nguyen and Morales-Santana. Because the court can affirm based on sex discrimination, it's not necessary to reach the question of transgender status discrimination, but HB 500 also fails on that basis. If the court does not find a case moot, the preliminary injunction should be affirmed. I welcome the court's questions. Couldn't you make a similar argument with respect to Title IX itself and the sex difference, the fact that you can have male and female sports? No, Your Honor. So I think the point would be, the question would be, would the sex line that's drawn in sports, and that's a line that does exist, you know, as a commonplace line, is that substantially related to the important state interest? Well, you could have individuals who, for example, don't present the problem of physically outmatching women in a particular sport, or a group of people who don't. Right, and the broader goal here, of course, is not sex separation for its own sake. The idea is to have equality in sports, and that's the ultimate objective that I think we're all talking about, not separation for its own sake. Well, my point is the argument that you're making now with respect to the subcategory, could it not also be made with respect to the sex separation in Title IX generally? Occasionally there have been examples of a boy challenging the separate teams because they want access to a team that's not available for the boys, because of the way Title IX works. To be clear, we have not aware of an example of somebody, a boy, challenging the sex separation so that they can be on the girls' team where there's a boys' team that exists. In that case, the courts do look at that under intermediate scrutiny, and they determine that the overall goal of ensuring equality in sport opportunity for women and men allows for the distinction. Counsel, I wonder if you could address what has been, I think, the basic focus of the discussion up till now, which is, as I see it anyway, whether or not we should view your position as a challenge to the distinction between boys and girls on the basis of sex, or whether or not you are perfectly comfortable with the distinction between boys and girls. You just want an exception to the biological definition of girls. Thank you, Your Honor. We're not asking for a particular definition or even really an exception. I think what we're asking for, and it is similar to the nature of the challenge that was brought in Caban. So the situation there were their unmarried fathers that were barred completely from objecting to their child's adoption. And there the father said, we'd like to be able to have that objection. We have a substantial relationship with the children. And there was actually a pretty tailored group in that case. In Justice Stevens' dissent, he points out it has to be an older child and there has to be a participation in the rearing for that subgroup. They were allowed to challenge that and get the relief. And I do note, too, that Justice Stevens pointed out that it was an indeterminately small subgroup of an unknown number of fathers. So I think that's the analogy that we would draw here to what we're asking. So what would be the appropriate inquiry? And it's asking you basically for your response to Mr. Bupan in particular that going sort of challenge by challenge, whether it's based on a transgender status or anything else in the situation, is really transforming intermediate scrutiny to strict scrutiny. We agree there would have to be a group. I don't think in our view, in a way, at least the way that the cases have worked out, and this is Caban and Lehrer, it also goes through Nguyen and Morales-Santana. I would also direct the court to the illegitimacy or the non-marital children case. Those are Trimble and Lally. They're cited in the BPJ brief. In the same way, I think the court looks, is there a definable group that's not just a person who happens to not meet the fit, but actually a group where the rationale doesn't make sense for the subgroup? But the group can be somewhat specific. Like in the case of Caban, it was actually unmarried fathers who had acknowledged paternity and had a substantial relationship. In the Trimble case, it was non-marital children who had a confirmation of paternity and a relationship with the father. Well, that sounds an awful lot like strict scrutiny, unless you're going to say whenever you can come forward with anything that is an exception to the boy-girl distinction, in any case at all, you can go forward with the strict scrutiny challenge. Whether it's 1% or whether it's 12 people, and I'm just not quite sure, grasping why your position isn't really an effort to apply strict scrutiny to a distinction that we haven't applied it to. Thank you, Your Honor. I do agree that cases are not that many in this context. I think it's possibly because facial challenges were more in vogue before, and now as-applied challenges are more preferred, and so that may be explaining why a statute in Caban, for example, wasn't viewed as carving out the statute for the people it couldn't be applied to versus facially invalidating it. But I do think it matters because it's not just a matter of fit that makes intermediate scrutiny different. There also has to be an important government interest, not a compelling one, and this is really critical. You can burden the right in intermediate scrutiny. So in Nguyen, for example, that person failed because he actually didn't take the steps that would be needed to confirm the paternity. So you're allowed to actually, he may have had a compelling case on a one-off basis that hey, I actually do have that relationship with the citizen father when I was born abroad, but he didn't take the steps that he needed to do. The same thing with Lair and the same thing with Lolly and the Trimble-Lolly line. So you can actually burden the right by saying, Lindsay, he got set to actually submit testosterone tests or something else different than other people, and that would not be allowed if it were strict scrutiny. And if we follow your approach, which allows a challenge to even a fairly small group that's affected, in what way would we not, that would apply across an entire range of things where there's a distinction currently between boys and girls, quite apart from just athletics. Is that correct? Your Honor, I do think that the question would, I think we're not trying to invent something here. I think we were trying to draw from what we understood to be precedent from the Court, and I would direct you to the Equal Protection Scholars Brief. They have some scholars that have actually focused on this question of what does an as-applied challenge mean in the equal protection context. But I think taking a step back, the question always would be looking at what the State's asserted interest is here. And here the State is not asserting an interest of having the boys' teams be better and the girls' teams be worse. What they're trying to do is control for a sex-based biological advantage. And so I think a lot of the hypotheticals that you can maybe understandably think about, what about the untalented cisgender boy, what about the transgender woman who didn't mitigate, you know, what about this or that, that gets taken care of because the testosterone is the advantage on this record, and almost all the people that might want to try to get an as-applied challenge under some other idiosyncratic framework would not be able to show that their exclusion actually... And this will be my last question. My point was more that how we approach the situation of looking at it not as boys versus girls, but whether or not there should be an exception with respect to the definition of girls. That would, if we were to look at it as boys versus girls, we would look at it as boys across the board and not simply to the area of athletics. I mean, I think it's a general framework for equal protection challenge that, again, predated this case, this litigation. There have been boys that have tried these challenges in the past. They generally have failed because they actually don't lack the opportunity or actually are treated... They're not being treated differently than similarly situated individuals. You said, Ms. Hartnett, that you're not talking about individual by individual by individual. It has to be a defined group. So how big does the group have to be? How does it have to be defined? And why are there those requirements? If what you're saying is right about equal protection law, why wouldn't it extend to individual by individual by individual? I don't think the court has foreclosed that, other than this actual, obvious conceptual question of, like, when do we get towards strict scrutiny? I think what I could tell you is that, in the way that the court looked at it, from Caban, to Lair, to Nguyen, to Morales-Santana, and then also Trimble and Lolly for the case of non-marital children, the court seems to usually be trying to figure out, not just is this individual somehow idiosyncratic, but are they part of a group that actually doesn't make sense to exclude? And that makes sense because usually you're trying to figure out, is the interest served by the exclusion? And there's usually some principle why a subgroup was not properly included. And what are the requirements? What does that need have to look like? Mr. Mouton suggested that it has to be fairly sizable. It can't be 1% or less. Why not? Why? What are the other requirements? How do you go about defining which subclasses get to make this challenge and which subclasses don't? That's a good question, Your Honor. I think in Trimble, this is, again, the non-marital children case incited in the BPJA brief, they said discreet categories that were unnecessarily excluded. That was the notion there. So I think that's where we were trying to make clear that we don't think it can just be, we have a person that is extraordinarily idiosyncratic, and they should get their case. And I don't think anything in your cases rules that out. I guess that's not actually the case presented here. We think we have an easier case because we actually have identified discrete subgroup, transgender women who do not have an athletic advantage. But I think you're answering Justice Kagan's question, which is fine. If you buy into the, you have this subgroup as you've identified it, Mr. Moupon says that subgroup has to be big enough. Do you agree? And if so, how do we evaluate that? I don't agree with that. I think that is, I think in a way this is the Kaban dissent kind of coming back after many decades because there Justice Stevens said in the dissent that the case in that case was assuming that the case extended only to himself and by implication to an unknown number of fathers and went on to say indeterminately small part. So I think there's never been a numerical requirement. It's more of a question of whether there's a principle that, some sort of a principle that allows for the exception in light of the failure to align with the interest that the state's asserting. And here, I think the record and we're at a preliminary injunction stage, but the preliminary record was that the exclusion of our client actually was not going to advance the interest nor the exclusion of other transgender women who do not, who have taken efforts to mitigate their testosterone, which was on the record here again, was the main driver of differential athletic performance. So one might wonder whether the efforts to refashion our equal protection jurisprudence here that we've been discussing at length on sex discrimination is really a fallback from what might be, one might wonder might have been your primary argument, which is that transgender status is itself a discreet and insular class, and I'm curious why you haven't brought that up and what thoughts you want to share with us. Your friend on the other side said the laws you pointed to in your brief don't address transgender persons as such, and that makes all the difference. Thoughts? Well, thank you for the opportunity to address that. I think we were trying to find the most straightforward way to help the court to an answer here, and I think we do. Well, I've been wondering what's straightforward after all this discussion. No, I understand. I think these are older cases, but it's very interesting to see the debate between the majority and Justice Stevens, and Justice Stevens and O'Connor kind of admitting that he was applying his dissent in Caban. So these are cases from the court. We think they have support. But to the question you've asked, I do think it's important to begin with, you heard my friend on the other side talk about cross-dressing or other laws. They didn't have any response to our point, because there isn't one, that transgender people were categorically excluded from immigration to this country under an overall umbrella of being a psychopath. That was the actual decision of this court in the Boutelier case. It was an interpreting language of Congress that determined that when Congress used the term psychopathic personality to exclude people, they meant to include homosexuals and other sex perverts. That's not our finest hour. Well, it's not your fault, but I think that... Thank you for that. No, no, no. This is by reference to a congressional report. They were trying to figure out what did Congress mean, and there actually was a public health service report. I would direct your attention to it, because I think it really does go to the level... I was surprised when I read this document. It's 1952, USCAN, 1653, 1701, trying to explain why sex perverts would include homosexuals, transvestites, which was the name of the day for transgender people. The term transgender did not become more common until now. So I think reading Boutelier and reading the USCAN that's cited in Boutelier is instructive. I also think that the laws on cross-dressing, I think that's an interesting point, because what that actually means as a practical matter for the transgender person was that they weren't allowed to leave their home as themselves to enjoy all of their civil rights. And I don't think... We don't want to exaggerate it, but we also don't want to understand that there were major cities in the country, Chicago, others, that actually barred you under subjective criminal penalty for leaving your house in clothes that weren't matching your gender. And people were actually prosecuted under those laws. So again, I appreciate it, and we're not saying you have to have the same history. We're certainly not equating the experience of the transgender community to that of black Americans or women. But just as illegitimacy or non-marital children has been recognized as a class that gets a closer look, I think we respectfully submit here it would make sense to do so. We appreciate, though, this is a question that the court hasn't recognized a suspect class for a long time. They also haven't shut the door to a suspect class since Cleburne. So I think we prefer, to the extent the court was still finding another path forward, the reason why we tried to help you find a way to answer the question here based on sex discrimination. Well, to pick up on the issue of discrimination on the basis of transgender status, let me just go back to... Let me go to some basics. Do you agree that a school may have separate teams for a category of students classified as boys and a category of students classified as girls? Yes, Your Honor. If it does that, then is it not necessary for there to be for equal protection purposes, if that is challenged under the Equal Protection Clause, an understanding of what it means to be a boy or a girl or a man or a woman? Yes, Your Honor. And what is that definition? For equal protection purposes, what does it mean to be a boy or a girl or a man or a woman? Sorry, I misunderstood your question. I think that the underlying enactment, whatever it was, the policy, the law, we'd have to have an understanding of how the state or the government was understanding that term to figure out whether or not someone was excluded. We do not have a definition for the Court. And we don't take issue with the... We're not disputing the definition here. What we're saying is that the way it applies in practice is to exclude birth sex males categorically from women's teams and that there's a subset of those birth sex males where it doesn't make sense to do so according to the state's own interest. Well, how can you... How can a court determine whether there's discrimination on the basis of sex without knowing what sex means for equal protection purposes? I think here we just know... We basically know that they've identified, pursuant to their own statute, Lindsay qualifies as a birth sex male, and she's being excluded categorically from the women's teams as the statute. So we're taking the statute's definitions as we find them and we don't dispute them. We're just trying to figure out, do they create an equal protection problem? Suppose this school that has a boy's, let's say, track team and a girl's track team. The school has that. And a student who has the genes and the reproductive system of a male and had those at birth and has never taken puberty blockers,  taken female hormones, never had any gender-altering or affirming surgery says, nevertheless, I am a woman. That's who I am. Can the school say, no, you cannot participate on the girl's team? Sorry, so you're just a birth sex male who has all the advantages of birth sex male hormones, and can the school borrow him from the women's team? Yes, they can. But that person, is that person not a woman in your understanding? If the person says, I sincerely believe I am a woman, I am in fact a woman. Is that person not a woman? I would respect their self-identity in addressing the person, but in terms of the statute, I think the question is, does that person have a sex-based biological advantage that's going to make it unfair for that person to be part of the women's team? And that's the rationale for the regulation, and so that's the way we would be testing that hypothetical. Well, the reason I'm asking has to do with discrimination on the basis of transgender status. So what you seem to be saying is, yes, it is permissible for the school to discriminate on the basis of transgender status, because if this person is a trans woman, a trans girl, and is barred from the team, from the girls' team, then that person is being subjected to differential treatment based on transgender status, right? Well, then the question would be whether the scrutiny would be satisfied. So from our perspective, that would be a transgender classification. It would get heightened scrutiny, and it may not be satisfied here because of the need to curtail unfair athletic advantage. That would be the analysis. We are not pressing in this case the notion, and the case does not require the court to decide whether transgender women who have gone through puberty and have not suppressed their testosterone would be able to play on a men's team. And the record here is a preliminary one where that doesn't present that question for the court. This does present a particular factual situation, and we have to decide that case, but looking to the broader issue that a lot of people are interested in, there are an awful lot of female athletes who are strongly opposed to participation by trans athletes in competitions with them. What do you say about them? Are they bigots? Are they deluded in thinking that they are subjected to unfair competition? No, Your Honor, I would never call anyone that. And I think what we're saying here is that that's the reason why there is intermediate scrutiny or even in rational review, you don't legislate based on undifferentiated fears. You base on trying to make a rational response to what is a perceived issue. I think here, although I would take issue with the notion that there was no reference to transgender individuals in the creation of this law, I really would direct the court to JA. Again, this is not about animus. I'm just saying that if you look at JA 105 through 112, there are numerous references from the sponsor of the law saying the way we're going to try to protect women's sports is to not have transgender women play on the women's teams, and that was the fear that they had at the time. Again, that is not an accusation of animus. It's just a question of what was the statute doing? And then we go to the point of does the statute survive heightened scrutiny? That would be the inquiry. Do you think that the success of trans athletes in women's sports is proportional to the percentage of trans athletes who participate in women's sports? I would direct your attention to there's an amicus brief that talks about actually some of the there are examples, obviously, of some transgender people that have participated and excelled. They actually are few and far between. We have our client here who tried to make the NCAA team because of the injunction. She was too slow. She played club soccer, club running. She was even an officer in one of those clubs just doing what you would hope a college student would do. You'll hear from my colleague about the other case. There's a brief in the amicus brief that will share the examples of showing that's a bit overstated. Would the analysis be different if they were more successful? No, I think it would be to the extent, I mean, we've already covered that transgender people are a meaningful slice of the population, but a small slice. I think the state, if there actually were a concern of women's sports being fully overrun by an outbreak of a huge new number of transgender people, that might be a different factual situation. At the end of the day, we understand that there were legislators who were concerned about that. The legislative history makes that clear here. But that wasn't the factual basis before the court. If there were actually a threat to women's participation in women's sports, that could be a different analysis because, obviously, the goal of sex equality in sports is a very important goal. We don't take issue with that. We just would say that I think this is an important moment to just take a step back and say, is this law actually responding to a problem in a rational manner, or is it actually overreacting on the presumption that transgender women are categorically going to be strong athletes when that's not the case? Well, just to put the big picture, and you know this on the table, and let you respond to it, but obviously one of the great successes in America over the last 50 years has been the growth of women and girls sports, and it's inspiring. And there are some states in the federal government and the NCAA and the Olympic Committee, so these are a variety of groups who study this issue, think that allowing transgender women and girls to participate will undermine or reverse that amazing success and will create unfairness, because you said if large numbers, well for the individual girl who does not make the team, or doesn't get on the stand for the medal, or doesn't make all league, there's a harm there. And I think we can't sweep that aside, and I think that's what's undergirding some of the concerns, big picture, and there are harms on both sides, so I completely understand that, but I just want to let you respond to that, because that is, you know, the NCAA, the Olympic Committee, a lot of states, federal government, that's a lot of people who are concerned about women's sports and think this raises a big problem, and I just want to make sure you can explain that. Thank you, Your Honor, and just to be clear, Title IX is a huge triumph, and I'm a veteran of women's sports myself, I'm glad it exists, it's made a huge difference in our society, that's not what we're talking about here, but I do think to the point of, you know, for the podium question, I think the question is, is there an unfair biological advantage, that would be the question, so I understand the point, if there's somebody who's coming in with an unfair biological advantage, that would undermine the entire point of separate sports in the first place, which was to allow women to have a place to thrive, to be strong, to win, not to just be the B team. The question in this case is if the person had actually mitigated their sex-based advantage, which, maybe interestingly, maybe counterintuitively, actually is more about circulating testosterone after puberty, than a lot of the other things we might think are sex-related, then that girl that's come in second to a transgender person that's mitigated, actually may just have come in second because the transgender person had a, not, was similarly situated, but was stronger in that one competition. That's why we are here not proposing a rule of absolute inclusion, but saying that in the case of people like our client who have mitigated, their exclusion doesn't match the statutory interest. Can I ask you a question about, analytically, in the discrimination on the basis of transgender status, since trans boys can play on boys' teams, how would we say that this discriminates on the basis of transgender status when its effect really only runs towards trans girls and not trans boys? We understand the point, and I think that might be relevant to a, for example, animus point, right? There were not a complete exclusion of transgender people, there was an exclusion of transgender women, but I think on that piece, this court has never required the whole class to actually be excluded to look at the cases to whether the exclusion of a subclass was... I was talking about for triggering intermediate scrutiny if transgender status is a suspect class. Right, so like Craig B. Boren, for example, that's the one about the men that couldn't get the age of 20-year-olds, right, that wasn't all men, it was a subset of men, and yet the court still viewed that as a sex classification subject to heightened scrutiny, and likewise here, even though it's just transgender women, in our view, that are being barred and not transgender men, that also would trigger heightened scrutiny, and I think there's the Rice v. Cayetano case from 2000, there's other examples of the court making clear that just because a subset of the protected class is being excluded, you still would apply heightened scrutiny. Another question about the science. So you were talking about circulating testosterone being kind of the marker. Idaho is saying, well, that's not the only indication. When I asked the question about six-year-old teens before that, that there are other just kind of genetic hardwired differences, maybe in size, et cetera, that don't have to do with circulating testosterone. Is it your understanding that testosterone is it? My colleague who will present argument in the next case is that the record there was more about pre-pubertal impoverty. I think that the 5% even is not clear whether that's just environmental or biological, actually. But I do think, so there are other things that I think, like height, bone size, there have been some other discussions of this. This is an underdeveloped record, by the way. This needs to go back and have a full trial, except that it's moot. But I think the point there is that no, I'm not trying to make a point on that. I'm not trying to pretend that I'm going to have a trial. But I think the point is that sometimes counterintuitively, it's like having a larger frame, but not having the muscle and the testosterone to drive it could actually put the person in a worse position. And that's a study that was commissioned by the Olympic Committee. Its footnote 6 of our brief indicates that actually it could be actually put the transgender woman at a disadvantage if they happen to have larger bones and less testosterone and muscle to drive those bones. Last question. So below, as I understand it, your client challenged the verification procedures? Yes. Except when we were talking about how this might be administered, I understood you to say that it would be by checking testosterone levels, because it would be okay to say to Justice Alito's hypothetical about the cisgender male who has taken no steps and who is now trans to exclude that person. But would that be an invasion? Would that be a violation itself or too invasive to require someone to, and maybe not just once, but maybe to periodic testing to make sure that the circulating testosterone was low enough? Why wouldn't that be invasive? So that's an ordinary blood work that a transgender person would get, and that's why I think it's of the nature of the minimal burdens like in Nguyen and the other cases where the court has said intermediate scrutiny applies and you actually can, you know, if there is minimal things you have to do to make yourself fall in the category that we want to keep protected, we can require that of you. Didn't you challenge it? Well, that was different actually, because the three things that you'd have to prove under the state's novel verification thing would have to be your genetic, your reproductive anatomy, which would require actually like a pelvic examination or examination of someone's, you know, nude area. It would be chromosomes, which would require chromosomal testing. That's not what we're talking about. Or it would be endogenous testosterone. And the reason why that wasn't a problem is not because of a blood test. It's not invasive. It's because it would have required the transgender person to stop their hormone treatment to get back to an endogenous level to be able to show they're endogenous. Okay, so the distinction between circulating and endogenous. Right, the point was that that was actually in a way like, and I'm not trying to cast aspersions, but it's kind of a false requirement for transgender people because they aren't on their endogenous testosterone when they're on hormone therapy. They're on a non-endogenous medical treatment. Thank you, counsel. Justice Thomas? Justice Alito? I'd like you to address this because you raised it with Justice Barrett. Is this case moot? Could you respond to the other side's positions or arguments as to why it wasn't? And how do you respond to that? Secondly, Justice Barrett did raise earlier this law applies even to primary schools, correct? Taking your second question first, yes, I don't think it's in the record whether or not there are any primary schools, whether they sex separate or not, but that is the law. And so at least as to that subgroup, no one could doubt that primary school children might have the strongest argument that there's no difference in their physical makeup that would cause harm or otherwise create an advantage, correct? That would be our position, Your Honor. In this case, we had both our client who was at college at the time, and then we had a high school intervener who was worried about being subject to the sex verification, so we didn't really get into the building a record on the law. But the point is that the law might be overbroad in many ways. Oh, certainly. And there's still, as you noted, this is a very, this, Idaho is the first or the second state to pass this law? It was the first. I mean, these cases come to you because they're early ones. And the record here was the most underdeveloped, correct? Including because it was a preliminary injunction. There was a substantial amount of expert material in the record that allowed the district court to make appropriate findings, but it was not the level that you build out for a trial. And both courts said that the record had to be looked at more carefully. Expressly, they did. All right, so answer the mootness question. Your Honor, all I can say is that we've tried to provide the court with accurate information as soon as it came to pass. In 2024, when we opposed certiorari, our client still was active in intending to play sports. The court granted the case. She was preparing for what she hopes is her final year of college. She was concerned about the increasing hostility and the visibility. I mean, we're here now, and that's okay. She understands. She brought the case. But that was the basis for her trying to end her sports career. And it isn't contrary to what she said before. She did intend to play sports through college. Her college has taken a long time. She's now sworn she will never play sports that are covered again, and she won't do that even if she happens to somehow win this case. So that is just the truth. But whether the court believes it's moot, that's, you know, we put those facts before you for you to decide. How about her graduating this year? There was a suggestion she might not. As you can tell, college students have their so she is trying her best to get through college. I think at this point, and I'm just basing it on what I know of as of today, that she's unlikely to graduate by May, as my friend said, but is hoping to make through summer credits to graduate in the fall. Finally, in terms of the sports teams, the Olympic team, that all happened in 2025 after our president directed them to leave. We do think that's worth parsing out. Again, there's been a lot of contentions made on both sides that are extra record, but I do think a lot of those things flowed from the executive order. There were some other sports orgs that were doing different things, but I think we have to be careful not to broad brush that because some of it may have been political, some of it may have been scientific, and the record really isn't fully before the court. Justice Kagan? I just want to get your understanding of what constitutional review would look like in this context. You said it's not individual by individual. You have to come in and say there's a class that's not being treated appropriately. What is that class here? Thank you, Your Honor. I would say I don't think the court has ruled out the individual case. I just think we weren't presenting it that way because we were trying to align ourselves with how the court had looked at it. I think we would say we represent the group of people that do not have an athletic advantage, that have mitigated their biological advantage of being born male. Who do not have an athletic advantage for reasons of taking certain medications or hormones? No sex-based biological advantage. It would encompass both people that had gone through the male puberty and had mitigated. It would also encompass others that have not yet gone through puberty or that staved off puberty with the puberty blockers. As to those people, who has the burden of showing that the justification doesn't fit? I think once we've identified the subclass under intermediate scrutiny, it is the state's burden to show a substantial relationship for that group, and they fail to, and that's how those other cases proceed. You wouldn't think that because we are talking about an as-applied challenge to a law that facially everybody can see is legitimate that the burden should shift to you. I don't think that's how the cases looked at it when they were assessing. They were kind of assessing whether the state had provided enough to allow the exclusion. For example, in LARE, the state had made an adequate showing to show why the parent in that case was properly excluded. And how do you think the question of scientific uncertainty should play out in an analysis like this? Thank you. That's a good question, and I know this was something the court did address in Skrimeti, a rational review case, but citing Carhart, which also talked about that. I think the one thing we definitely want to have is complete findings, so that's why we really were urging to have a full record developed before there were any final judgment of scientific uncertainty. I think the court has not fully grappled with what does scientific uncertainty mean, and how does it come into conflict with heightened equal protection scrutiny, but I think we don't need to present that yet because on this record, there was not    question of whether or not the denigrated testosterone was the determinant. Maybe on a later record that would come out differently. Just play it out a little bit if there were scientific uncertainty. I mean, if it really were an equipoise, then I think that is a situation where I think it's still heightened scrutiny. So under heightened equal protection scrutiny, the burden is on the state to justify the law, and if they haven't been able to justify that, that usually fails. If it's really a question of they're at 50-50, do we allow the state some leeway? I don't think that's been answered in the court's cases. Normally the heightened scrutiny controls and there's not a deference on top of that in the equal protection context. Thank you. Just to follow up on that, I wonder if that starts to sound like strict scrutiny because the point of intermediate scrutiny, of course, is some leeway for the state, not a perfect fit, at least in the facial area. But if there's scientific uncertainty about whether puberty blockers and testosterone suppressants completely or mostly or some percentage of the time eliminate all competitive advantage, some competitive advantage, I mean, you've been very careful, I think, and rightly so to talk about mitigating advantage. But I don't know, you know, does the state have to show that it eliminates advantage and it doesn't eliminate some percentage of advantage remains in each individual case or for the group as a whole? I'm struggling to understand your response to Justice Kagan on that score. Maybe I'm inartfully posing the question, but I hope you understand. I do understand your question. I think the question is at some level, I mean, I think the question is where you have science that's developing in real time at some level, what happens? How does that dovetail with trying, a state that's trying to regulate and do that? I think what we can say on this record is the categorical exclusion is really not supported, I don't think, by any science. There's going to, this again was from kindergarten through college, and so there'd be some subgroups at least. And I appreciate, I think there has to be an effort to try to tailor it. I think here the problem was there was a reaction of transgender women, a picture of what that would be, kind of an undifferentiated fear, frankly, from the Cleveland case. I appreciate all of that, but it seems to me from my glance at the record, and quite a record it is, that there is a healthy scientific dispute about the efficacy of some of these treatments, and that's understandable. And I'm just wondering, how does that fit with, assume there is some dispute. And I understand the record remains to be developed further, but how does that fit with intermediate versus strict scrutiny? At the end of the day, it's the state's burden to show a substantial relationship, and I think in the case of something where they're doing their best and have the best evidence, some evidence to support what they're doing. Some evidence, the best evidence, exactly. A level of evidence that wasn't met here. So the one, the study and the findings, I mean, the district court made a really good point. That study had actually been retracted, and it didn't meet the standards. So in a way, this is not the hardest case. I appreciate it as a hypothetical. I guess what I would just urge in this area that's sensitive, obviously, politically, but also as a matter of science, to at least let a record develop in one of these cases that lets you decide, actually, is this 50-50 versus 80-20? All right, but 50-50, does the government win? Does 70-20, the government win? That's what I'm getting at. I understand the complexity of the record and the difficulty of the science, but if we're going to have individual cases brought, that's the kind of question we're going to ultimately have to answer. Not the science question, but the percentage question, if you will. No, I understand that. I mean, VMI does provide some sort of a metric of what we would do there, which is we'd love to see there were kind of evidentiary debates on both sides of that, but even if you could say that a lot of women may not have ever made the cut, the fact that there were some that did was enough to invalidate the entire policy. So I think there are ways for courts to make those judgments, and I think the court has not yet, I think, encountered a case where heightened scrutiny puts a heavy burden on the state. It's not an insurmountable one, like strict scrutiny normally is, and then what happens if it ends up with the evidence being a tie or close to it when we go back to the trial court? I think that would be breaking some new ground, because I don't think there's an equal protection case that decides that issue. Usually the evidence is kind of clear on one side or the other about whether the restriction is justified. That remains for us to decide at a later point. I do think that's the most prudent, but definitely on a record that's more developed, because I think in the end of the day it might end up being a surprise to, we don't know yet, but I think we have some good evidence that actually at the end of the day, being a transgender woman, actually to the extent there are, and you've repressed your testosterone, you're at somewhat of a disadvantage in many ways, because you have, again, this larger frame with weaker muscles and no testosterone. Thank you. Justice Kavanaugh? Just to follow up on Justice Gorsuch's question, a broader frame about the role of this court when there's scientific uncertainty. There'll be different district courts who do different things, almost certainly in different cases, and in an area of scientific uncertainty where there's strong assertions of equality interests on both sides, and so it's going to come to this court and we have to decide for the whole country, constitutionalize this. I guess, given that half the states are allowing it, allowing transgender girls and women to participate, about half are not, why would we, at this point, just the role of this court, jump in and try to constitutionalize a rule for the whole country while there's still, as you say, uncertainty and debate, while there's still strong interests on the other side? And I think one of the themes of your argument's been, the more people learn, the more they'll agree with you, at least I've detected that theme in your argument. So why would we get involved at this point and constitutionalize? I understand the question, Your Honor, and I do think that the Equal Protection Clause's demands have never been viewed as a separate avenue from the legislative process. They can and do often coexist, and here I think the point is we have two as-applied challenges to early laws. They have their unique cases in their own right. I don't think this court needs to set rules forever in this area. I think the most important thing would be to allow a record to develop, even in areas of controversy, and we look back, where you cited, Insgrametti, you cited Carhartt, there were extensive findings. There also were findings in VMI. There were findings in Craig v. Boren. I'm learning things by reading these cases over again. There were findings in those cases, and so I think that at least before the court decides to either step off fully or to embrace its role here of providing the scrutiny that should be attended to groups when there's a worry that the democratic process isn't actually going to fairly respond to their concerns, I think the point at least amendment would be get a full record, which we don't have here. That would be my request. Thank you. Justice Barrett? Justice Jackson? Thank you, counsel. Rebuttal? Thank you, Mr. Chief Justice. A few points. I heard just a moment ago that there is no real threat to women's sports. We strenuously disagree. We cite the court, we cite your honors to the U.N. Special Rapporteur's report that says 600 women have lost 890 medals in 29 different sports. That's what we're talking about. It is a real threat. Medical transition does not reliably suppress all athletic advantages. I'd cite your honors to our record in which our expert, Dr. Brown, shows the experience of one C.C. Telfer, an elite track athlete who underwent a medical transition and whose track times did not change. That is the story in many situations, and unless we can reliably distinguish between those situations and the situations in which testosterone suppression does reliably eliminate the advantage, then we can't do that. We need a broader classification, and sex is the right one. And if it were merely politically motivated, I would add we wouldn't see this same rule being implemented by World Athletics, World Boxing, the NAIA, these different groups that were not influenced by recent politics but came to these decisions after studies, after lengthy examination, and reached the same decision that Idaho has. Justice Gorsuch, in your analysis, that this is not the same as the discrimination that has been faced on the basis of race or on the basis of sex in this country. We agree it's not close to the discrimination that people have faced on the basis of race or sex in this country. That said, the Court does not need to reach that answer here, because if there is no quasi-specify, if there is no transgender status classification in Skermeti, there certainly cannot be one in this case. In fact, as our briefs argue, the Court can and should avoid all these questions by applying rational basis review. Bottom line, sports are assigned by sex because sex is what matters in sports. It is the fairest and the safest and the most administral way to assign sports teams. It's been widely accepted for many decades because it's necessary for fair competition because where sports are concerned, men and women are obviously not the same. If Idaho can't enforce a sex-based line here in sports where nobody disputes that biological differences matter, then no line based on biological sex can survive constitutional scrutiny. The Court should uphold the Fairness in Women's Sports Act and reverse it. Thank you, Counsel. The case is submitted.